REDBARN CHEMICALS, INC. *v.* F. K.
BRADSHAW SR. ET AL

73-23                                        494 S.W. 2d 720

Opinion delivered May 28, 1973

*Garland Q. Ridenour,* for appellant.

*Richard E. Griffin* and *Robert J. Johnson,* for appellee.

GEORGE ROSE SMITH, Justice. This action was brought by Redbarn Chemicals, Inc., to recover judgment upon an $11,479.91 open account for agricultural chemicals and fertilizers sold by Redbarn to the defendants, F. K. Bradshaw, Sr., and his son. The trial court, sitting without a jury, sustained the defendants' contention that the plaintiff's claim was void for usury. For reversal Redbarn argues on direct appeal that the Bradshaws failed to prove that the debt was usurious.

We find the proof sufficient to support the judgment. The account extended over a period of many years. It was Redbarn's practice to send a monthly statement to the debtors, showing the previous balance, the debits and credits during the month, the finance charge that was being added for the month, and the new balance. The statement for the period ending April 28, 1970, showed a previous balance of $12,739.97 and a finance charge of $126.40, which was recited to be "computed by a periodic

rate of 1.00% per month which is an annual percentage rate of 12.00%." Thus according to Redbarn's own statement an interest charge exceeding the legal rate of 10% per annum was imposed for the month in question.

Redbarn advances three arguments in its effort to rebut the prima facie showing of usury. First, it is contended that the excessive charge was due to an innocent mistake on the part of the person who operated the computer that printed the monthly statement. According to Redbarn's testimony, the company does business in a number of states. Its usual finance charge is 12% a year, but in Arkansas it charges only 10%. A Redbarn witness theorized that the overcharge was due to the computer operator's failure to punch the right key in feeding data into the machine.

Apart from the issue of credibility that is inherent in Redbarn's testimony, contradicting evidence was adduced by the debtors. Bradshaw, Jr., testified that when he claimed certain credits which Redbarn refused to recognize, Redbarn's agent Wheatly threatened to impose a 1% monthly interest charge if Bradshaw did not pay the account as rendered. Wheatly was not called as a witness to deny Bradshaw's testimony. According to Bradshaw's recollection, the next monthly statement that he received after Wheatly's threat was the one containing the excessive charge. Unquestionably that testimony constituted substantial evidence upon which the trial court could find that the charge was deliberate. Furthermore, a Redbarn witness admitted that the company had made other similar overcharges in Arkansas.

An honest mathematical miscalculation may be shown to avoid a charge of usury. *Cox* v. *Darragh Co.,* 227 Ark. 399, 299 S.W. 2d 193 (1957). On the other hand, a factual finding of usury is often made even though the creditor insists that he made an innocent error. *Ford Motor Credit Co.* v. *Catalani,* 238 Ark. 561, 383 S.W. 2d 99, 11 A.L.R. 3d 1494 (1964); *Holland* v. *C. T. Doan Buick Co.,* 228 Ark. 340, 307 S.W. 2d 538 (1957); *Brooks* v. *Burgess,* 228 Ark. 150, 306 S.W. 2d 104 (1957). This being a law case, the controlling test on appeal is whether the trial court's judgment is supported by substantial evidence. *Holland*

*supra; Fields* v. *Sugar,* 251 Ark. 1062, 476 S.W. 2d 814 (1972). The testimony that we have narrated is manifestly substantial in quality.

We are not impressed by the suggestion that the usurious charge was made by Redbarn unilaterally, without the debtors' knowledge or acquiescence. The unpaid account was of long standing. For more than two years its amount was in excess of $10,000. There is no suggestion in the record that the Bradshaws expected to be financed by Redbarn without any interest charge. According to the proof, monthly computerized statements, including a service charge, had been sent by Redbarn for a full year before the excess charge was imposed. After the date of the excessive charge the Bradshaws were credited with seven payments upon the account, the largest being a $3,000 payment on February 11, 1971. On November 2, 1971, in the month before Redbarn filed this suit, Bradshaw, Jr., wrote a letter in which he recognized his debt of $11,479.91 to Redbarn and outlined the steps that he was taking to make payments on the debt. Thus the trial court was justified in concluding from the overwhelming weight of the evidence that the Bradshaws were aware of the monthly finance charges, that they voiced no objection to those charges, and that they made payments upon the account with knowledge that the charges were included.

Secondly, Redbarn argues that no evidence except the April, 1970, statement (or invoice) may be considered, because counsel stipulated at the beginning of the trial that "the defense of usury raised by the defendant pertains to one invoice only, that invoice being dated April 28, 1970 . . . . This invoice . . . is the only invoice in issue pertaining to the defense advanced by the defendant." In our opinion the plain language of the stipulation merely excluded all the other invoices from consideration and did not exclude other evidence. Moreover, counsel for both sides so construed the stipulation in the trial court, for they both adduced relevant proof in addition to the invoice itself.

Thirdly, Redbarn introduced proof tending to show that if all its twelve monthly finance charges during the

calendar year 1970 were added together, the overall interest rate would be only 9.69%, despite the excessive charge in April. That theory of the case is not supported by the proof. There is no suggestion that interest was charged by the year rather than by the month. In fact, an annual charge would have been impossible, because the amount of the open account varied from month to month as debits were added and credits were given. The creditor's intention was undoubtedly to impose a finance charge upon each monthly balance. Hence the present argument is actually an effort to retroactively purge the account of the taint of usury, which cannot be done. See the *Catalani* and *Brooks* cases, *supra*.

There is also a cross appeal. When Redbarn filed its complaint in December, 1971, it attached the defendants' harvested crops. In the following month the attachment was dissolved, on the defendants' motion, for want of any statutory ground to support it and without loss to the defendants. They now contend that they should be awarded an attorney's fee for their successful defense of the attachment.

Our longstanding rule has been to deny counsel fees in such a situation, but in *Young* v. *Farmers Bank & Tr. Co.*, 248 Ark. 613, 453 S.W. 2d 47 (1970), we expressed a willingness to re-examine our position in an appropriate case. This, however, is not such a case. In jurisdictions allowing such fees the award is made only for the defense of the wrongful attachment as distinguished from the defense of the main case on its merits. See *Great American Indemnity Co.* v. *Sweetwater Mining Co.*, 74 Nev. 219, 326 P. 2d 1105, 65 A.L.R. 2d 1422 (1958), and especially the A.L.R. annotation. Here the record provides us with no basis for fixing a fee with respect to the attachment only. Apparently an evidentiary hearing was held, but if so the testimony that was taken is not in the record. Hence it would be academic for us to re-examine our rule at this time, for the record does not justify the allowance of a fee even if one were proper.

Affirmed.

Jones, J., dissents.

J. Fred Jones, Justice, dissenting. I do not agree with the majority opinion in this case. As I read the constitutional prohibition against usurious interest and the cases of this court applying the constitutional penalty for usurious exaction, I am persuaded that the majority opinion, under the facts of this case, goes further than we have previously gone and further than I am willing to go.

Article 19, § 13, of the state Constitution provides as follows:

"All contracts for a greater rate of interest than ten percent per annum shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law; *but when no rate of interest is agreed upon,* the rate shall be six per centum per annum." (My emphasis).

In the case of *Briggs* v. *Steele,* 91 Ark. 458, 121 S.W. 754, this court said:

"To constitute usury, there must either be an agreement between the parties by which the borrower promises to pay, and the lender knowingly receives, a higher rate of interest than the statute allows for the loan or forebearance of money; or such greater rate of interest must be knowingly and intentionally 'reserved, taken or secured' for such loan or forebearance. It is essential, in order to establish the plea of usury, that there was a loan or forebearance of money, and that for such forebearance there was an intent or agreement to take unlawful interest, and that such unlawful interest was actually taken or reserved.

The wrongful act of usury will never be imputed to the parties, and it will not be inferred when the opposite conclusion can be reasonably and fairly reached."

This same rule was reiterated in the case of *Briant* v. *Carl-Lee Brothers,* 158 Ark. 62, 249 S.W. 577.

I am not unmindful of such cases as *Wilson* v. *Whitworth,* 197 Ark. 675, 125 S.W. 2d 112, and *Brittian* v.

*McKim,* 204 Ark. 647, 164 S.W. 2d 435, where we held that it is not essential that both parties must agree to the usurious rate of interest before the contract may be void, but in those cases the usurious rate of interest and the charges relate back to the inception of the contract. In *Wilson* the debtor signed a blank note which turned out to be usurious. He borrowed and received $150 but the note was for $259.11 secured by life insurance on which the lender received commission.

In the case at bar the Bradshaws purchased chemicals, fertilizers and seeds from Redbarn on open account over a period of approximately five years. When the suit was filed, Redbarn claimed that the Bradshaws owed $11,-479.91 on the open account. The invoices on purchases went out from the commission agent's office in Arkansas and statements were mailed out from Redbarn's home office in Oklahoma. Mr. Lawrence, the commission agent, admitted, and it was also stipulated, that there was one invoice in the running account for merchandise delivered to the Bradshaws which indicated a service charge of 1% per month but he testified that he knew nothing about this charge until the suit was filed in this case and I am satisfied with Redbarn's explanation of this one invoice as hereafter indicated.

This entire case comes down to the proposition that the Bradshaws purchased merchandise from Redbarn on an open account with no contract agreement or understanding as to interest. Redbarn sent out periodic statements to its credit customers and if the account was not paid within 50 to 90 days, Redbarn *unilaterally* started charging a service charge on all unpaid balances amounting to 1% per month on the unpaid balances in all states except Arkansas. The Arkansas accounts were computerized on the basis of .79% to stay within the 10% limitation, and this amount was charged on, and added to, the unpaid balances of the delinquent accounts in Arkansas beginning with the third monthly statement after the original purchase.

Mr. Bradshaw testified that the difficulty arose over his account when Redbarn delivered more seed and chemicals than he needed and refused to take the excess back

as they had agreed to do. He said that he used about $12,000 worth of the seed and that the excess seed and chemicals he could not use, amounted to between $700 and $1,000. He said that Redbarn agreed to pick these items up and give credit for same but failed and refused to do so. He said that Mr. Wheatly and Mr. Dodson came to see him about the account and he told them of the agreement he had with their commission agent, Mr. Lawrence, as to picking up and giving credit for the excess seed and chemicals, and that he told them he thought they should square the account up before they could expect full payment. Mr. Bradshaw then testified as follows:

"Q. All right. Now, did you have other conversations with this Mr. Wheatly?

A. Yes, Mr. Wheatly called on me several times. On one occasion, Mr. Wheatly told me I should pay the account, and I told him that we were still at odds on it, and he told me that *the company was going to charge me one percent per month* on it, on the thing, *if you didn't pay it.* And, then Mr. Wheatly after our conversation, left." (My emphasis).

Mr. Bradshaw said that after he had this conversation with Mr. Wheatly he started receiving statements with additional interest designated.

It is my opinion that Redbarn made a logical explanation of an honest error in computerizing the one invoice on which the charge of 1% per month was made; but, I would reverse this case simply because this was a suit on a running open account in which Mr. Bradshaw owed no interest and agreed to pay none, and on which no interest was charged to him until the unpaid account was 90 days old. He failed and refused to pay the account simply because he contended that Redbarn had breached the contract made between him and Redbarn's commission agent when he purchased some seed and chemicals in connection therewith. It was while Mr. Bradshaw was withholding payment of approximately $12,000 he admits owing on the account, that Redbarn's representative threatened to charge him 1% interest per month if he did not pay the full account.

In the case of *Mitchell* v. *Duncan,* 190 Ark. 598, 79 S.W. 2d 997, Duncan purchased furniture from Mitchell in the amount of $274.26 and executed a note for that sum. Three payments were endorsed on the note but Duncan insisted that a $70 payment was made and only $50 was credited on the note. A subsequent agreement was endorsed on the note which recited: "By agreement the balance on this note with interest to date is one hundred and ninety dollars ($190)." This memorandum was signed by Mrs. Duncan and her mother. On a suit to collect the note the defense of usury was interposed. This court held that there was no testimony warranting the submission of the question of usury to the jury. A statement was sent to Mrs. Duncan and her mother showing the balance due on the note less the credits thereon to the date of its renewal, and the statement also showed the alleged balance on renewal with interest compounded at ten per cent. In that case we said:

> "There was no authority to compound the interest; neither was there any agreement to pay compound interest. A wrongful demand for excessive interest would not constitute usury where there had been no agreement to pay it."

In *Blalock* v. *Blalock,* 226 Ark. 75, 288 S.W. 2d 327, it was stated:

> "Usury consists in contracting for payment of interest greater than the law allows. Usury is not to be inferred when neither the borrower promised to pay a greater rate of interest than the law permits, nor the lender knowingly entered into a usurious contract."

It is my opinion that Mr. Bradshaw had a right to withhold payment until his rights under the alleged breach of contract could be determined; and, having agreed to pay no interest when he entered into the contract for the seed and chemicals, he should have simply tendered to Redbarn's agent or into court the amount he admitted he owed, and should have refused to pay interest, certainly in an amount more than 6% per annum, on the account Redbarn claimed was delinquent.

566

I would reverse this case and remand for a new trial for a determination of the amount Mr. Bradshaw owes under his claim of breach of contract, with any interest to which Redbarn may be entitled limited to the legal rate of six per cent.